# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

MICHAEL L. DATTA,
       Plaintiff,

v.                                                        Case No. 05C1057

KATHY JESS, DR. CORRELL,
DR. HOFTIEZER and DR. KAPLAN,
       Defendants.[1]

## DECISION AND ORDER

Plaintiff Michael L. Datta filed this pro se civil rights action pursuant to 42 U.S.C. § 1983, claiming that defendants violated his Eighth Amendment right to adequate medical treatment while in prison. Before me is defendants' motion for summary judgment.

### I. BACKGROUND

From January 14, 2005 through May 3, 2005, plaintiff was incarcerated at Dodge Correctional Institution (DCI). From May 3, 2005, through the date that the present action was filed, plaintiff was incarcerated at Oshkosh Correctional Institution (OCI). Defendant Kathy Jess is the Warden of OCI. Defendants Timothy A. Correll and Scott A. Hoftiezer are physicians at DCI and defendant Roman Y. Kaplan was a physician at OCI at all times relevant to this action.

Plaintiff suffers from chronic, severe leg, back and neck pain stemming from a pre-incarceration work-related injury for which he received a spinal fusion and because of which

---

[1] Kathy Jess has been identified as Cathy A Jess (see July 7, 2006, Aff. of Cathy A. Jess), Dr. Correll has been identified as Dr. Timothy A. Correll (see July 7, 2006, Aff. of Timothy A. Correll), Dr. Hoftizer has been identified as Dr. Scott A. Hoftiezer (see July 7, 2006, Aff. of Scott A. Hoftiezer) and Dr. Kaplan has been identified as Dr. Roman Y. Kaplan (see July 7, 2006, Aff. of Roman Y. Kaplan).

he uses a wheelchair. When plaintiff first arrived at DCI, plaintiff was being treated with significant daily doses of several painkillers – Morphine, Oxycontin, and Lidoderm. He was also taking psychiatric medications. After meeting with plaintiff and examining him, Hoftiezer discontinued the Morphine and Oxycontin and prescribed Methadone and Oxycodone, believing Methadone to be just as effective as Morphine and Oxycodone at treating pain and less likely to be abused. (Hoftiezer Aff. ¶ 23.)

On January 21, 2005, plaintiff complained that the newer drugs were less effective. Hoftiezer increased plaintiff's daily dose of Methadone and added to plaintiff's drug regimen a daily dose of Benadryl to alleviate Methadone's side effects. Five days later, plaintiff again met with Hoftiezer and reported that the increased Methadone and Benadryl helped, but that his pain continued. Hoftiezer again increased plaintiff's Methadone dose and referred him to an orthopedist at DCI for pain management suggestions. On February 2, 2005, plaintiff again told Hoftiezer that the Morphine and Oxycontin had worked better than Methadone and Oxycodone. Hoftiezer examined plaintiff and increased his daily dose of Methadone.

On February 16, 2005, Hoftiezer reviewed plaintiff's pre-incarceration medical records and noted that plaintiff had been receiving more opiate pain medication prior to incarceration than had been previously reported. He ordered that Lidocaine patches be applied every day to plaintiff's back and that plaintiff be given an anti-anxiety medication every morning and at bedtime. Hoftiezer next examined plaintiff on February 24, 2005. At that time, plaintiff complained of headaches, poor sleep, inadequate pain control and arm paresthesias.[2] Upon examination, plaintiff exhibited no acute distress and normal body

---

[2]Paresthesia is best described as "pins and needles" or a funny sensation that could signal that a pinched nerve was causing the pain. (Hoftiezer Aff. ¶ 33).

2

posture in his wheelchair. Hoftiezer assessed plaintiff's range of motion, neck pain and low back pain, and ordered x-rays. On February 28, 2005, Hoftiezer saw plaintiff and diagnosed him with bronchitis. At that time, he reduced plaintiff's daily dose of Oxycodone, apparently because Oxycodone can lead to respiratory depression.

On March 4, 2005, plaintiff was examined at the DCI orthopedic clinic. On March 10, 2005, Hoftiezer ordered that plaintiff continue his current dose of Methadone, and on March 14, 2005, prescribed daily doses of Lidocaine and Diphenhydramine for pain management, as well as Diazepam, a psychiatric medication that alleviated plaintiff's back spasms, to be added to plaintiff's existing doses of Methadone and Oxycodone. The next day, plaintiff had an orthopedic evaluation and then saw Hoftiezer again. Hoftiezer examined plaintiff, met with the orthopedist about plaintiff's needs, and ultimately increased plaintiff's daily dose of Methadone and Oxycodone, ordered tests to look for the presence of nerve damage and referred plaintiff to the University of Wisconsin Pain Clinic. One week later, the nerve tests came back negative. Hoftiezer determined that plaintiff had no acute injuries and was suffering from chronic pain associated with his old injury and suggested that opiates (Methadone and Oxycodone) be gradually decreased and substituted for other pain medications more appropriate for long-term pain management. Plaintiff was displeased with this suggestion and requested a second opinion.

On March 29, 2005, plaintiff met with defendant Correll for a second opinion. Correll telephoned plaintiff's non-institutional surgeon, but the surgeon had no advice for him. Upon observing plaintiff interact with other inmates, Correll determined that plaintiff was exaggerating his pain. (Correll Aff. ¶ 19.) Correll discontinued plaintiff's Oxycodone and Lidocaine and called for a gradual tapering of Diazepam. He continued with plaintiff's then-

3

current level of Methadone. On April 8, 2005, plaintiff again met with the orthopedist, who determined that plaintiff should receive physical therapy. One week later, Correll ordered physical therapy and discontinued Benadryl, finding that plaintiff was overly sedated. On April 26, 2005, Correll began reducing plaintiff's Methadone dosage. On May 3, 2005, plaintiff was transferred from DCI to OCI and was not further treated by Hoftiezer or Correll.

Prior to plaintiff's transfer to OCI, defendant Kaplan, who would be taking over plaintiff's treatment at OCI, conferred with Correll regarding plaintiff's medical conditions. It was Kaplan's understanding that plaintiff's condition included a back injury for which he had one or two surgeries and that plaintiff was dependent on opiates. (Kaplan Aff. ¶ 18.) Kaplan's goal was generally to reduce plaintiff's dose of Methadone to the lowest effective dose in order to reduce side effects and drug dependence. (Id.) On May 4, 2005, plaintiff met with Kaplan and requested that Kaplan reinstate the multiple narcotic medications plaintiff used before he was incarcerated. Kaplan examined plaintiff and found that his complaints of pain were inconsistent with examination findings and with observations of plaintiff interacting with the general prison population. Kaplan ordered that plaintiff's daily dose of Methadone be gradually decreased, referred plaintiff to a psychologist to provide support during opiate withdrawal, offered plaintiff the use of a hot tub at the to help relieve his chronic pain, and referred plaintiff to the Pain Clinic at the University of Wisconsin Hospital.

On July 20, 2005, plaintiff was seen at the Pain Clinic. A clinic doctor recommended a low dose of Methodone – about what plaintiff was taking at that point – along with an anti-

4

depressant.[3] He further found that the goal of Methadone was to reduce pain and improve function, and if that result did not occur, plaintiff should be tapered off the Methadone. Carrell met with plaintiff after this appointment and instituted the clinic doctor's suggestions. On September 6, 2005, plaintiff complained to Carrell of increasing pain and Carrell increased the Methadone slightly, to the maximum recommended by the Pain Clinic. On November 14, 2005, plaintiff indicated that his current Methadone dosage was working fine and that he was able to move around and function normally. Thereafter, plaintiff's dosage of Methadone received minor adjustments up and down.

Plaintiff alleges that Hoftiezer, Correll and Kaplan's termination of certain of plaintiff's pain medications and reduction of others amounted to cruel and unusual punishment.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." Id. For the fact to be material, it must relate to a dispute that "might affect the outcome of the suit." Id.

---

[3]Plaintiff seems to erroneously believe that the Pain Clinic determined that his Methadone should be increased.

The moving party bears the initial burden of demonstrating that he is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the moving party seeks summary judgment on the ground that there is an absence of evidence to support the nonmoving party's case, the moving party may satisfy its initial burden simply by pointing out the absence of evidence. Id. at 325. Once the moving party's initial burden is met, the nonmoving party must "go beyond the pleadings" and designate specific facts to support each element of the cause of action, showing a genuine issue for trial. Id. at 323-24. Neither party may rest on mere allegations or denials in the pleadings, Anderson, 477 U.S. at 248, or upon conclusory statements in affidavits, Palucki v. Sears, Roebuck & Co., 879 F.2d 1568, 1572 (1989).

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, it is "not required to draw every conceivable inference from the record - only those inferences that are reasonable." Bank Leumi Le-Israel, B.M. v. Lee, 928 F.2d 232, 236 (7th Cir. 1991).

### III. DISCUSSION

Defendants argue that defendant Jess was not personally involved in providing plaintiff medical care and thus is not liable for any Eighth Amendment violation and that none of the defendants were deliberately indifferent to plaintiff's serious medical needs. They also argue that they are immune from liability under the doctrine of qualified immunity.

To date, plaintiff has failed to file a response to defendants' motion for summary judgment. As such, I will decide defendants' motion without his input.

6

### A. Jess's Liability

Jess is not liable for reasonably relying on the medical judgment of professionals. Liability under § 1983 arises only when a defendant is personally responsible for the deprivation of which the plaintiff complains. Johnson v. Snyder, 444 F.3d 579, 583 (7th Cir. 2006); Gentry v. Duckworth, 65 F.3d 555, 561 (7th Cir. 1995). To be personally liable for a subordinate's acts, a supervising official "'must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye.'" Johnson, 444 F.3d at 583-84 (quoting Gentry, 65 F.3d at 561). Jess does not recall and cannot locate any record of a complaint from plaintiff to her regarding pain, either orally or in writing. It is clear that even if defendants Hoftiezer, Correll and Kaplan were deliberately indifferent to plaintiff's serious medical need, there is no indication that Jess had any personal involvement in plaintiff's medical care.

### B. Physician Defendants' Liability

The Supreme Court has interpreted the Eighth Amendment's proscription against cruel and unusual punishment as imposing a duty upon the states to provide adequate medical care to incarcerated individuals. Boyce v. Moore, 314 F.3d 884, 888-89 (7th Cir. 2002). To establish liability under the Eighth Amendment, a prisoner must show: (1) that his medical need was objectively serious; and (2) that the official acted with deliberate indifference to the prisoner's health or safety. Id. In the present case, there is no dispute that plaintiff had a sufficiently serious medical need for purposes of the Eighth Amendment. Thus, I turn to whether defendants were deliberately indifferent to that need.

A prison official acts with deliberate indifference when "the official knows of and disregards an excessive risk to inmate health or safety," Farmer v. Brennan, 511 U.S. 825,

7

837 (1994), or when he acts "intentionally or in a criminally reckless manner," Tesch v. County of Green Lake, 157 F.3d 465, 474 (7th Cir. 1998).  Neither negligence nor even gross negligence is a sufficient basis for liability.  See Salazar v. City of Chicago, 940 F.2d 233, 238 (7th Cir. 1991).  A finding of deliberate indifference requires evidence that the official was aware of the risk and consciously disregarded it.  Farmer, 511 U.S. at 840-42.

Dissatisfaction or disagreement with a doctor's course of treatment is generally insufficient.  Johnson v. Doughty, 433 F.3d 1001, 1012-13 (7th Cir. 2006).  However, if particular "symptoms plainly called for a particular medical treatment – the leg is broken, so it must be set; the person is not breathing, so CPR must be administered – a doctor's deliberate decision not to furnish the treatment might be actionable under § 1983." Steele v. Choi, 82 F.3d 175, 179 (7th Cir. 1996).  In addition, a medical professional's erroneous treatment decision can lead to deliberate indifference liability if the decision was made in the absence of professional judgment.  Johnson, 433 F.3d at 1013.

Plaintiff complains that the physician defendants inadequately treated his severe neck, back and leg pain.  However, the record reveals that defendants diligently sought the appropriate treatment for plaintiff's pain, conducting tests, providing plaintiff with a second opinion when requested and even referring him to the University of Wisconsin Pain Clinic for further professional treatment.  In the course of plaintiff's first year of incarceration, he was seen by Hoftiezer on numerous occasions.  After requesting a second opinion as to treatment, he was seen by Correll several times and Correll consulted with his surgeon.  In addition, plaintiff was examined by an orthopedist.  After plaintiff's transfer to OCI, he saw Kaplan several times and visited the Pain Clinic.  The evidence shows that defendants were

8

responsive to plaintiff's complaints of pain and regularly adapted his treatment based on their professional opinions of plaintiff's changing medical needs.

It is undisputed that plaintiff was not receiving the kind of pain medication that he wanted or the quantity that he wanted; essentially, plaintiff wishes he was still taking his pre-incarceration regimen of opiates. However, due to prison security considerations and concerns that plaintiff had developed a dependence on pain medications, defendants chose a different course of treatment that they believed to be effective. Over time, they prescribed him less pain medication. However, this does not indicate that the doctors were deliberately indifferent. Hoftiezer took plaintiff off Morphine and Oxycontin. However, he replaced them with Methadone and Oxycodone because such drugs have a lower chance of being abused and are more appropriate for chronic pain. Correll discontinued plaintiff's Lidocaine and Oxycodone prescriptions, and gradually reduced plaintiff's daily dose of Diazepam. Correll asserts that he did so because plaintiff presented seemingly exaggerated complaints of pain and appeared to be dependant on the drugs. Plaintiff claims that Hoftiezer and Kaplan told him that they categorically would not provide prisoners with opiates. However, Hoftiezer and Kaplan deny making such statements and it is undisputed that plaintiff was provided with Methadone and Oxycodone, both of which are opiates.

Given the physician defendants' diligent efforts to treat plaintiff's pain, the record does not support a finding that any defendant was deliberately indifferent to the plaintiff's serious medical needs. See Forbes v. Edgar, 112 F.3d 262, 266-67 (7th Cir. 1997) (stating that an Eighth Amendment plaintiff is not entitled to demand specific treatment); see also Ciarpaglini v. Saini, 352 F.3d 328, 331 (7th Cir. 2003) (stating that disagreement with medical professionals about treatment needs does not state a cognizable Eighth Amendment claim).

9

## IV. CONCLUSION

Therefore,

**IT IS ORDERED** that defendants' motion for summary judgment (Docket #13) is **GRANTED**.

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment dismissing the plaintiff's claims and this action.

Dated at Milwaukee, Wisconsin, this 20 day of March, 2007.

/s
LYNN ADELMAN
District Judge

10